[Civ. No. 1009. Fourth Appellate District.—August 29, 1932.]

FRANCES C. BOWMAN, Plaintiff and Respondent, v. HORACE D. BOWMAN, Defendant and Respondent; BRYAN HOUSTON BOWMAN, Appellant.

Hill, Morgan & Bledsoe and Kenneth K. Wright for Appellant.

Stearns, Luce & Forward for Plaintiff and Respondent.

MORTON, J., *pro tem.*—This is the second appeal in this action of Frances C. Bowman to annul the marriage of Horace D. Bowman and Bryan Houston Bowman. In the first trial judgment was entered for Frances C. Bowman, Bryan Houston Bowman appealed and the judgment was reversed. (*Bowman* v. *Bowman,* 97 Cal. App. 613 [275 Pac. 1023, 1024].) Frances C. Bowman asked for a rehearing, which was denied and hearing in the Supreme Court was also denied. Then Frances C. Bowman moved for a new trial in the court below on the ground of the insufficiency of the evidence to sustain the findings. This motion was granted and the case was tried again. Judgment was again entered in favor of Frances C. Bowman and Bryan Houston Bowman again appeals.

From a study of the record before us we find the facts to be as follows: Frances C. Bowman and Horace D. Bowman intermarried October 16, 1915; on September 28, 1923, Frances C. Bowman filed suit for divorce against Horace D. Bowman; Bryan Houston, a girlhood friend of twenty years who had often visited in the home of the Bowmans,

staying over week-ends, and who had encouraged Frances many times not to put up with the conduct and ill treatment of Horace, appeared and testified as her corroborating witness; on October 13, 1923, Frances obtained an interlocutory decree of divorce.

About July 27, 1924, Horace and Frances became reconciled, effected a condonation and resumed marital relations. On October 22, 1924, they moved to Pasadena and after a day or two Horace moved some of his belongings to a Los Angeles hotel for the purpose of taking medical treatment and to be away from the noise of the children. While at the hotel, and after receiving a letter from Bryan Houston, he decided to ''walk out on'' Frances. On October 28th he called on his attorney, David P. Hatch, and arranged that he should call F. F. Grant at San Diego, attorney for Frances, and request him to have the final decree of divorce entered. Bowman did not inform his attorney that there had been a reconciliation and condonation, and Grant, without knowledge of the reconciliation and condonation and without communicating with Frances, had the final decree entered October 28, 1924. Three days later Horace left on a trip east, called on Bryan Houston in New York and they became engaged. November 20, 1924, Horace met Frances by prearrangement at Salt Lake City and they celebrated the birthday of their older son, stopping at the same hotel but occupying separate rooms. Horace returned to Los Angeles November 21, 1924, and on December 22, met Frances and his children at the train upon their return from Salt Lake City and assisted them in moving to a house in Pasadena. He, however, continued to live at a Los Angeles hotel. Early in January, 1925, Horace assisted Frances and his children to move to Santa Monica, and on January 15, 1925, he told her of the entry of the final decree. This was her first information concerning it. About a week later Frances wrote to Bryan Houston, then in New York, that the reconciliation had failed, that the final decree had been granted and of Horace's deception in getting it, and that they were telling people about it and that it was a good end to a bad mess.

On April 21, 1925, Horace D. Bowman and Bryan Houston were married, and a week later Frances learned of

the marriage. Horace and Bryan returned to Los Angeles in May, 1925. On May 23, 1925, Frances wrote to an attorney friend in Portland for legal advice. On June 6, 1925, she consulted an attorney in Los Angeles. Another conference with this Los Angeles attorney occurred in July. During the latter part of July, 1925, Horace and Bryan had trouble and Horace consulted an attorney regarding the possibility of an annulment of their marriage. In August, 1925, Frances several times consulted her former attorney, F. F. Grant, in San Diego, and in September, 1925, he advised her that in his opinion she could, by motion, secure the setting aside of the final decree of divorce. This was the first time she had been so advised. On October 19, 1925, Frances filed her application to set aside the final decree of divorce and two days later notice was served upon Horace but no service was made upon Bryan.

Horace and Bryan separated on October 25, 1925. The final decree of divorce of Horace D. Bowman and Frances C. Bowman was set aside November 2, 1925, and two days later Frances brought this action to annul the marriage of Horace D. Bowman and Bryan Houston Bowman. On December 1, 1925, Frances and Horace became completely reconciled, a third child has been born to them and they still continue to live together.

In this action to annul the marriage of Horace D. Bowman and Bryan Houston Bowman, defendant Horace D. Bowman answered, admitting the allegations of the complaint. Defendant Bryan Houston Bowman answered, denying the allegations of the complaint, plead certain affirmative defenses and filed a cross-complaint naming Frances C. Bowman and Horace D. Bowman as cross-defendants and praying that the order vacating their final decree of divorce be set aside and annulled, to which each filed an answer. In the first trial judgment was entered denying the prayer of the cross-complaint, and vacating, annulling and setting aside the marriage of Horace D. Bowman and Bryan Houston Bowman. Defendant and cross-complainant Bryan Houston Bowman appealed on the judgment-roll. (*Bowman* v. *Bowman, supra.*) The District Court of Appeal reversed the judgment, with directions to the trial court to enter judgment against Frances C. Bowman denying her prayer

for annulment of the marriage of Bryan Houston Bowman and Horace D. Bowman and ordered that judgment be entered in favor of Bryan Houston Bowman as prayed for in her cross-complaint against both cross-defendants, and that the order made in the action entitled *"Frances C. Bowman* v. *Horace D. Bowman"*, numbered 40292, in the Superior Court of San Diego County, purporting to set aside and vacate a final decree of divorce, be set aside, vacated and annulled, and that the final decree of divorce stand as a subsisting and valid decree. A petition for rehearing was denied by the District Court of Appeal and petition to have the case heard in the Supreme Court was also denied, Justices Richards and Langdon dissenting. After judgment had been entered in accordance therewith respondent Frances C. Bowman moved for a new trial upon the ground of insufficiency of the evidence to sustain the findings. This motion was granted and the action was retried. Judgment was again entered in favor of Frances C. Bowman and Bryan Houston Bowman again appeals.

At the second trial of this action evidence was introduced which changed the picture as to Bryan being an innocent third party. The cross-complaint filed by Bryan alleged that after being told by Horace of the entry of the final decree of divorce, and later having received a letter from Frances conveying the same information, she relied upon this knowledge and married Horace. She further alleged that Horace and Frances entered into a conspiracy and secret agreement to set aside the final decree and annul her marriage with Horace, thereby defeating and defrauding her of·her marital rights. She further alleged that Frances allowed one year to pass before acting to set aside the final decree.

To the introduction of evidence concerning alleged relations between the husband and Bryan Houston prior to the entry of the interlocutory decree of divorce and prior to the reconciliation of Horace and Frances, counsel for Bryan objected on the ground that these matters were incompetent, irrelevant and immaterial and wholly collateral to any issue in the case. If the hands of Bryan Houston Bowman were tainted with fraud concerning the case at bar the trial court was entitled to this information and the objection was properly overruled. In the case of *Man-*

*hattan Medicine Co.* v. *Wood,* 108 U. S. 218 [27 L. Ed. 706, 2 Sup. Ct. Rep. 436], Mr. Justice Field said (quoting from the opinion of Chief Justice Duer in *Fetridge* v. *Wells,* 4 Abb. Pr. (N. Y.) 144): " 'Those who come into a court of equity, seeking equity, must come with clean hands and a pure conscience. If they claim relief against the fraud of others, they must themselves be free from the imputation.' " (See, also, *Castroville Co-op. Creamery Co.* v. *Col,* 6 Cal. App. 533 [92 Pac. 648].)

We must now consider the law of the case as established in *Bowman* v. *Bowman, supra.* First, it should be noted that the appeal was taken on the judgment-roll only and the District Court of Appeal determined as follows: "The appeal presents the question as to whether or not the conclusions of law were supported by the findings, and whether or not, in view of the findings of fact, the cross-complainant should have been granted the relief prayed for in her cross-complaint." Second, the judgment of the trial court was reversed on two points: (1) "We determine that, irrespective of whether appellant was a necessary or proper party to the proceeding to vacate the final decree, she was entitled to notice of the application, as one whose rights as a wife have been injuriously affected by the order vacating the final decree of divorce, and that she is entitled to complain of the fraud practiced upon the court and upon herself, and, by her cross-complaint in equity, have the said order set aside and annulled. . . . (2) The second reason we find which would indicate that the judgment in this case should be reversed is that, in our view, the order made in the proceedings in the divorce suit after the entry of the final decree was void, as being in excess of the jurisdiction of the court, because: (a) Frances C. Bowman was guilty of laches, as affirmatively appears in findings VII and IX, in delaying her application for suit herein from the early part of January, 1925, when it is found she first knew of the entry of said final decree, until November 2, 1925, a delay of approximately ten months; (b) She was estopped from the right to make application for an annulment of the final decree, as it affirmatively appears from said finding that when she first learned of the final decree in the early part of January, about three months after her own counsel had applied for and ob-

tained the said decree on October 28, 1924, she acquiesced therein, expressed satisfaction therewith, and was willing and desirous that said decree should stand as a valid and subsisting decree. After she learned of the marriage of Horace D. Bowman to Bryan Houston Bowman, which took place in April, 1925, Frances C. Bowman accepted all of the benefits granted her by the said decree in the way of support, maintenance and the custody of minor children, etc. She thereby confirmed and ratified the action of her attorney, Mr. Grant, in causing the issuance of said final decree. She made no effort thereafter to have said decree set aside until November 2, 1925, more than a year after its issuance, by which time the trial court had lost jurisdiction to vacate it or set it aside, under the well-established law of this state.''

On the first appeal the appellate court did not determine that Bryan Houston Bowman was a necessary or proper party to the proceedings to vacate the final decree of divorce. However, upon the findings of the trial court it was held that she was entitled to notice of the application as one whose rights as a wife were involved and entitled to complain of the fraud practiced upon the court and herself. ▮ In numerous decisions the Supreme Court of this state has laid down the rule that the law of a case only applies so long as the evidence develops the same state of facts. If the facts produced at the second trial are essentially different the rule ceases to be of binding force. In *Klauber* v. *San Diego Street Car Co.,* 98 Cal. 105, 107 [32 Pac. 806], the court held: ''It is only when the same matters that were determined on the first appeal are brought before it on a second appeal that the rule can be invoked; and, being a rule which tends to prevent a judicial consideration of the case, it is not to be extended beyond the exigencies which demand its application; and it is therefore held that whenever upon the second hearing the record presents a different state of facts, the former determination ceases to be an estoppel.'' (*Mitchell* v. *Davis,* 23 Cal. 381; *Bennett* v. *Wilson,* 133 Cal. 379 [85 Am. St. Rep. 207, 65 Pac. 880] ; *Otten* v. *Spreckels,* 183 Cal. 252, 254 [191 Pac. 11] ; *Estate of Baird,* 193 Cal. 225, 233 [223 Pac. 974]; 2 Cal. Jur. 950.)

■ After a careful examination of the evidence and the findings of the trial court we believe that at the second trial a different state of facts presents itself for determination. In the second trial the findings held that there was no conspiracy and agreement between respondent Frances C. Bowman and respondent Horace D. Bowman to defraud either the court or Bryan Houston Bowman as to the entry of the final decree and that Frances on her own initiative, and without assistance from Horace, was the moving party to set aside the final decree. Further, it was held that the proceedings to vacate the final decree were not kept secret from Bryan and there was no agreement between Frances and Horace to institute this present annulment action if the motion was granted. The court further found that the affidavits upon which the final decree of divorce was set aside were true; that Horace did not oppose said motion because he had no defense and had been so advised by his counsel; that Frances and Horace were living together as husband and wife in pursuance of their reconciliation when the final decree of divorce was granted; that they continued to live together until November 1, 1924; that Bryan Houston knew of the reconciliation and condonation between Horace and Frances which had commenced in July, 1924, and continued until after the final decree had been entered; that Bryan Houston for many years had been an intimate friend of Frances, frequently visiting in the home of Frances and Horace, and, while accepting their hospitality, engaged in a secret love affair with Horace; that for this reason Bryan desired to bring about a separation and advised and encouraged Frances to secure a divorce; that the conduct and influence of Bryan was a cause of the separation and divorce; that Bryan was a corroborating witness in the divorce action and testified in support of Frances' allegations; that Bryan had possession of all the facts of this case which were then before the court and nothing connected with the case was unknown to her and there were no facts in her possession that would have caused or required or justified the court in refusing to set aside the final decree of divorce; that she had no defense to the motion to set aside the final decree and no facts existed which would have caused its denial; that had she been served and had she been present at the hearing and

produced all said facts no different or other action would have resulted. It now appears from all the evidence and the findings in the second trial that Frances was the innocent party deceived by fraud practiced over a number of years by her supposed friend Bryan Houston.

█ In the first trial of the case and on the appeal, Bryan Houston Bowman appeared an innocent third party, a second wife about to be defrauded of her rights by a conspiracy and agreement between the husband and the first wife. On the present appeal, from the evidence and the findings, she now appears as the third person in the original divorce action. With her knowledge of the facts surrounding the securing of the interlocutory decree, the condonation and reconciliation, and the manner by which the final decree was obtained, it should be said, as in *Medina* v. *Medina*, 22 Colo. 146 [43 Pac. 1001], that a person acting under such a decree is not entitled to the protection of the court as she acquired no rights in good faith upon which she could rely under a decree of court.

The evidence shows that in July, 1925, Horace and Bryan discussed a separation and a possible annulment of their marriage. Bryan knew that Horace had written to a Kansas City attorney regarding it and at approximately the same time she consulted legal counsel in Los Angeles. It appears that Horace desired a separation and that Bryan was opposed to it. Prior to the motion to set aside the final decree (during September and October, 1925) Horace told Bryan several times that Frances was starting a lawsuit in the old divorce matter to open up the matter of the divorce and property and everything concerning her situation. After the papers were served on him he told Bryan that Frances had started the suit. Bryan knew in what court the divorce action had been tried, she had appeared as a witness for Frances, and she knew how the final decree had been secured. She had ample information to put her on inquiry immediately. "In the absence of positive law or order of court requiring notice, it may be stated as a general rule that, where a fact as to which notice might otherwise be required, is one which the party has means of ascertaining from a definite known source, or which is equally known to both parties; no notice thereof need be given." (46 Cor. Jur. 552; *Tynan* v. *Kerns*, 119

Cal. 447 [51 Pac. 693]; *Prouty* v. *Devin*, 118 Cal. 258 [50 Pac. 380].) A court of equity does not allow one to take advantage of his own fraud and will refuse to lend its aid to assist in enforcing a fraudulent imposition upon government, public, or private individuals. When parties are *in pari delicto*, a court will leave them where it finds them, after purging its records of the fraud practiced upon the court. (12 Cal. Jur. 779.)

The first trial court by its findings held that Frances learned of the granting of the final decree in January, 1925, and made no effort to set it aside; on the contrary, she acquiesced therein, expressed satisfaction that it had been granted and her willingness that it should stand as valid and binding, and that she had accepted benefits under said decree after the marriage of Horace and Bryan. Presented with this finding, the District Court of Appeal, with no evidence or knowledge of the fraud of Bryan Houston, naturally concluded that Frances was guilty of laches, having, according to their conclusion, waited ten months before moving to set it aside. The only party injured by the delay was Bryan and in the eyes of the appellate court she appeared the innocent second wife.

 With both the evidence and the findings at our command we are able to get the entire picture of the situation. According to the record before us there had been a complete reconciliation and condonation between Frances and Horace. In January, 1925, he told her that he had secured a final decree in October and, stunned by his deception, she endeavored to cover her disappointment by saying she was satisfied. Between January and April, Horace came to the home frequently to see the children and Frances tried upon several occasions to discuss the matter of the divorce with him but he would reply, "Oh, forget it." He would tell her that what he had done was for her best interest. She testified that he had her convinced there was nothing she could do about it. In April, 1925, she learned of the marriage of her husband to her former friend and confidante and of their secret love affair. The discovery of this fraud first crushed her, then caused her to act. In view of this evidence it is here that the time should start, if at all, upon which to base a charge of laches. It was at this time that Frances discovered the

fraud practiced by Bryan upon her. She testified that investigation brought additional light and then in June she sought legal advice. Up to that time the law was somewhat uncertain, but the case of *McGuinness* v. *Superior Court,* 196 Cal. 222 [40 A. L. R. 1110, 237 Pac. 42] (decided May 29, 1925), clearly determined the principles involved for a motion to vacate the final decree. In that case it was held that in an action for divorce, where there had been a reconciliation, condonation and a resumption of marital relations after entry of the interlocutory decree, and if, during that period, the husband without the knowledge of the wife secured a final decree of divorce, these facts constituted extrinsic fraud upon the court and the court retains jurisdiction to set aside the final decree upon motion of the wife. Upon the advice of her Los Angeles attorney she consulted attorneys in San Diego during August and September and in October her motion was filed to set aside the final decree. The motion was heard on November 2, 1925, and the final decree was set aside by order of the Superior Court of San Diego County. Within approximately *six months* of the discovery of the fraud her motion had been made and granted.

After distinguishing the law of the case as found by the District Court of Appeal in *Bowman* v. *Bowman, supra,* and in view of the entirely different state of facts as shown by the evidence and findings on the second trial now before us, we must turn to the proper function of courts in dealing with fraud practiced upon them. In the case of *McGuinness* v. *Superior Court, supra,* we find that an almost identical state of facts as is here involved is defined as extrinsic fraud and that the court retained jurisdiction to set aside its decree, and its right so to do is not derived from section 473 of the Code of Civil Procedure, nor limited to the time therein specified. In the case of *Ex-Mission L. & W. Co.* v. *Flash,* 97 Cal. 610 [32 Pac. 600], it was held that a motion to set aside a judgment upon the ground of fraud in its procurement is not subject to the six-months' limitation provided in section 473 of the Code of Civil Procedure and in the opinion in that case it is pointed out by the court that said section of the code while providing for relief in cases of "mistake, inadvertence, surprise or excusable neglect" does not include "fraud" among

the grounds upon which relief from a void or voidable judgment may be sought under its terms.

The introduction of the additional evidence involved the question of fraud on the part of appellant, Bryan Houston Bowman, and the determination of her rights involved a consideration of her acts and representations under the light of the law as to fraud. In the case of *Dealey* v. *East San Mateo Land Co.*, 21 Cal. App. 39, at 43 [130 Pac. 1066, 1068], the court says: ''Here the fraud is not against the defendant, but against the public. Pleading such a fraud is not a condition precedent to the court's taking cognizance of it. As soon as it is disclosed to the court, whether alleged in the proceedings or not, that the contract between the parties contemplates a fraud upon the public, it must *sua sponte* refuse to grant any relief to either party based on such contract. (Citing cases.) It is the duty of courts to protect the public at all times against fraud and one way of doing so is by closing the doors to would-be or actual perpetrators of such fraud who would fain make use of the court to divide the spoils between them.''

In *Mitchell* v. *Cline*, 84 Cal. 409 [24 Pac. 164], we find the court quoting Pomeroy's Equity Jurisprudence, section 401, as follows: ''Where two or more have entered into a fraudulent scheme for the purpose of obtaining property in which all are to share, and the scheme has been carried out so that all the results of the fraud are in the hands of one of the parties, a court of equity will not interfere on behalf of the others to aid them in obtaining their shares, but will leave the parties in the position where they placed themselves.''

Ignoring for the moment the children of Frances and Horace, let us find who were the parties interested in the original divorce action. The record discloses Frances C. Bowman as plaintiff and Horace D. Bowman as defendant. The case of *Lane* v. *Superior Court*, 104 Cal. App. 340, at 345 [285 Pac. 860, 863], clearly protrays the true parties to every marriage contract when an action comes before the court for an interlocutory decree. ''There are two major reasons why the law requires a year to intervene between the interlocutory and the final decree of divorce. One is to permit the determination of the paternity of children and the other, not less of interest to society, is to

permit, if possible, the husband and wife to compose their difficulties and become so reconciled to one another that the marital relations may be resumed and no final decree of divorce become necessary. If the marriage relation found its inception in a civil contract of the two parties in the performance, existence and termination of which they alone be concerned, our task would be a simple one. But in every such contract there is a third party vitally interested, the society in which we live, and representing it, the government which gives that society the permanence upon which its existence depends. For this reason the rules of marriage are prescribed by law, and the right of dissolution should be jealously guarded." The interest of the third party, "the society in which we live", our government and the public in general, requires a careful analysis of all the facts before a marriage contract is dissolved. It must be admitted that the true guardian of the American home is the wife and mother. If a child is led astray she never relaxes her effort to bring him back. If the husband, through sickness, weakness of character or inability to resist the appetites of human nature, errs, and the wife still loves him because of what he used to be, or because he is a fond and loving father to her children, has she not the right to endeavor to bring him back under the proper circumstances and re-establish her home and family? From the evidence we must conclude that this husband with his wife and children constituted a happy family until Bryan Houston became involved in a secret love affair with the father. Then friction arose and we find Bryan Houston writing to the wife, "Every one gets into trouble but only smart people get out of it," and frequently saying to her in the supposedly close confidence of a twenty-year friendship, "I would not live with him," and, "I would get a divorce from a man who treated me that way." She appeared as a corroborating witness to assist the wife in getting free from the husband whom, "I would not live with." Throughout the years of friction and litigation the love of the husband and father for his children continually drew him back to his first home. Approximately eight months after the interlocutory decree there was a reconciliation and condonation concerning which Frances wrote in detail in two letters during August of 1925 to her supposedly close

friend, Bryan Houston, telling her how happy they all were. These letters were not answered by Bryan. The husband after secretly securing the final decree of divorce on October 28, 1924, very promptly told Bryan about it and from that moment by reason of the letters previously written her by Frances, which she admits receiving, and her own personal knowledge of the reconciliation, she was charged with notice that said final decree was fraudulently obtained. Without hesitating, and before Frances knew of the final decree, she became engaged to Horace during the early part of November, 1924, less than a month after the granting of the final decree and before she had received the letter of January 16, 1925, from Frances expressing satisfaction over the granting of the final decree. From the evidence we conclude that Bryan Houston knew she was involved in and a principal cause of the family's troubles and had designingly advised the wife to leave her husband and get a divorce; that she had personal knowledge of the reconciliation and condonation; that she had knowledge the final decree was granted through concealment and fraud upon the court; that Frances, without knowledge of the fraud, designing advice and betrayal of friendship by Bryan, had expressed satisfaction with the granting of the final decree possibly to cover her pride and anguish. In spite of all this knowledge Bryan Houston married Horace D. Bowman. It is apparent she was fully aware of the fact that the legal eligibility of Horace for a marriage to her was upon very uncertain ground and that whenever the fraud upon which his freedom had been secured was exposed the court might properly revoke and annul the entire judgment.

The question squarely before this court is, Shall Bryan Houston Bowman be allowed to take advantage of her own fraud and stand on the technical ground of lack of legal notice and a finding of laches against an innocent party, made by a court before which these facts did not then appear, or, shall the court purge its records of the fraud?

Society is entitled to a condemnation of the tactics of Bryan Houston Bowman. We should permit this mother and defrauded wife to re-establish her home and family. In the case of *Rehfuss* v. *Rehfuss*, 169 Cal. 86 [145 Pac. 1020, 1022], our Supreme Court directed attention to the

fact that actions for divorce differ from ordinary suits between private parties in the degree of solicitude which the law as well as public policy imposes upon the court in the interest of preserving the integrity of marriage relations. The court says: "That relation is the basis of the family, the foundation of society. It cannot be destroyed by the mere consent, whim, or caprice of the parties to the marriage, nor can it be stipulated away in judicial proceedings. The relation can be dissolved only by consent of the state, and upon statutory grounds, presented in good faith to a court of competent jurisdiction. . . . It is the duty of the court, representing the state, in accordance with the letter and policy of the law, to guard strictly against fraud, collusion or imposition."

In the case at bar we find fraud practiced upon the court, upon society, and upon three children, two born prior to the divorce proceedings and the third after the final reconciliation and condonation. The fraud which permeates this case cannot be condoned by the court, and cannot be allowed to brand this third son with the stigma of illegitimacy. Preservation of the sanctity of the marriage state is essential to the continuance and betterment of organized society. "The state has an interest in the maintenance of the marriage tie which neither the collusion nor the negligence of the parties can impair." (*Rehfuss* v. *Rehfuss, supra.*) A full consideration of the law and the evidence leads to but one conclusion, that the judgment of the trial court should be affirmed. It is so ordered.

Marks, Acting P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 23, 1932, and the following opinion then rendered therein:

MORTON, J., *pro tem.*—Counsel for appellant in their petition for rehearing do not seem to grasp the underlying reasons for our affirmance of the judgment of the lower court.

Bryan Houston Bowman filed her cross-complaint in the court below seeking to vacate an order of the superior court which set aside the final decree of divorce terminating the

marriage of Frances C. Bowman and Horace D. Bowman. In filing this cross-complaint she took the position of a plaintiff (cross-complainant) asking relief in a court of equity. The trial court, upon ample evidence, found that she did not come into court with clean hands. Under the well-established doctrine of equity, that a person must come into a court of equity with clean hands, the trial court denied her the relief she sought in her cross-complaint, and in so far as she sought redress under its allegations, left her where it found her. For a like reason, among others, we also left her in the same position she occupied at the time she filed her cross-complaint, in so far as the relief she sought by this pleading is concerned.

Petition for rehearing denied.

Marks, Acting P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 27, 1932.